# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| GEORGETTE MCGINNIS<br>and G.G.,<br><br>    **Plaintiffs,**<br><br>    **vs.**<br><br>MUNCIE COMMUNITY<br>SCHOOL CORP., et al.,<br><br>    **Defendants.** | **Cause No. 1:11-cv-1125-WTL-TAB** |

## ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT

This cause is before the Court on a motion for partial summary judgment filed by

Defendants Muncie Community School Corporation, Eric King, and Christopher Smith. Dkt. No.

72. The motion is fully briefed,[1] and the Court, being now duly advised, rules as follows.

## I.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court

accepts as true the admissible evidence presented by the non-moving party and draws all

reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.

2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on

its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a

---

[1] This action was originally filed by McGinnis individually and as next "best friend" of
G.G. However, during the course of this case, G.G. reached the age of majority.
Accordingly, G.G. has since been added as a real party in interest. Counsel for McGinnis has also appeared as
counsel for G.G. and G.G. has indicated that she wishes to rely on the arguments raised in
McGinnis's summary judgment papers in response to the Defendants' motion.

genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.    <u>BACKGROUND</u>

The facts, taken in the light most favorable to the non-moving party, are as follow.

On November 9, 2010, Plaintiff G.G. was raped by Defendant Steven Moore in a restroom at Muncie Central High School ("MCHS"). G.G., a sixteen-year-old sophomore, was walking through a hallway near the gymnasium during her lunch period, on her way to obtain lotion from her gym locker. Moore, also a student at MCHS, stepped out of a men's restroom and called her over to him. G.G. walked over to Moore, who then pulled G.G. into the men's restroom. Once inside the restroom, Moore picked up G.G. and carried her into a restroom stall where he started taking off her pants. G.G. tried to fight back, but Moore proceeded to pull G.G.'s pants down and forced her onto the floor, where he got on top of her and started having sexual intercourse with her. G.G. tried to push Moore off of her, but she could not get away because he was too heavy. G.G. estimates that she was in the stall with Moore for about five to eight minutes before he left. G.G. then went into a women's restroom, where she noticed she was bleeding. G.G. wiped herself off and went back to the main hallway where she saw a friend, whom she asked for a change of clothes because she was bleeding. Her friend, J.S., asked what was wrong, and while G.G. did not tell her at first, G.G. eventually told J.S. that Moore had raped her. J.S. took G.G. to the office to report the rape.

Between 12:20 p.m. and 12:30 p.m., J.S. and G.G. approached Assistant Principal Kathaleena McCord in the hallway, who took them into her office. There G.G. told McCord

what had occurred. McCord then radioed for MCHS Principal Christopher Smith. When Smith did not answer, McCord went looking for him and found him in his office. Smith returned with McCord to her office, where he questioned G.G. about what had happened. Smith then left the office and radioed for Jackie Samuels, the associate principal, and the school nurse.

The nurse arrived and immediately started talking to G.G, who told the nurse that her vagina hurt. At 12:38 p.m., McCord took J.S. out of the room and intended to send her back to class, but Smith instead took J.S. to his office, where she wrote a statement about what she knew.

At some point, Samuels, McCord, and Smith met in Smith's office to "make decisions as to who was going to do what." McCord Dep. at 47:11-15.[2] Smith told McCord to review the video footage from the hallway cameras and Smith himself would call the administration building. Samuels was told to call G.G.'s legal guardian, the Youth Opportunities Center (the "YOC"), but when she asked whether she should call security, Smith told her, "Not yet." No one called the police or child protective services.

At 12:45 p.m., Samuels attempted to contact the YOC, and when Samuels finally reached Crystal Dunigan at the YOC, Dunigan "let [Samuels] know that [she] would contact G.G.'s counselor to make sure there was nothing going on within her counseling that could . . . possibly trigger something . . . . as in if G.G. was not telling the truth." Dunigan Dep. at 16:3-9. Dunigan informed Samuels that the YOC felt that G.G. needed to go to the hospital and they were sending someone to pick up G.G.

---

[2] McGinnis contends that, during this meeting, Smith informed McCord and Samuels that G.G. lived at the YOC and had a history of lying. The Defendants contend that this statement is inadmissible hearsay. The Court does not include McGinnis's version of the meeting in its statement of facts, but in doing so, it does not rule on the Defendant's objection. Rather, the record citations provided by McGinnis for this fact do not support it, and the Court excludes this fact on that basis.

At approximately 1:10 p.m., Smith called the administration building to talk with Assistant Superintendent Tim Heller. However, Heller was unavailable, so Smith talked with the Director of Secondary Education, JoAnn McCowan. Smith informed McCowan of the reported rape and asked McCowan for "guidance" on "what the next steps might be." Smith Dep. 70:10-11. McCowan first spoke with Administrator Lon Sloan and then instructed Smith to question the accused, but not to involve security, and to have another administrator present when Smith questioned Moore. Smith explained that the defendants were concerned with determining the veracity of the allegations.

At approximately 1:25 p.m., Smith and Samuels questioned Moore. Moore admitted knowing G.G. from class, but denied having any sexual contact with G.G. When asked why he was in the hallway during lunch, Moore said that he was going to the library. However, later in the conversation, Moore changed his story, stating that he never made it the library. Moore further informed Smith that he and G.G. had exchanged notes, but that he had thrown the notes away. At some point, Smith informed Moore that he "had nothing to worry about." Smith did not have Moore write a statement, but Samuels took notes of Moore's responses. Moore was then released back to class.

At approximately 1:49 p.m., Tameka Ross from the YOC arrived to pick up G.G. to take her to the hospital. Samuels stopped Ross to talk to her about the rape. Ross and G.G. left the school at approximately 2:15 p.m.

At approximately 2:20 p.m., Smith instructed Athletic Director Tom Jarvis and MCHS security guard Mike Edwards to search G.G.'s and Moore's lockers for notes. Edwards was not informed that the search was due to a pending investigation of a rape that occurred at the school.

Notes were found, but it was later determined that the notes were not written between G.G. and Moore.

By this time, Sloan and McCowan had arrived at MCHS. The administrators inquired into the situation, but they did not tell Smith to call the police or CPS. Instead, Sloan, McCowan, Smith, and Samuels conducted vice principal interviews until shortly after 4 p.m.

At 2:36 p.m., G.G. was admitted to the emergency room. Between fifteen and twenty minutes after Ross and G.G. arrived at the hospital, the police arrived.[3] Within an hour of G.G.'s arrival, an assault nurse was called and came to the hospital to perform a rape kit. Following the exam, G.G. was released to Ross, and Ross took her back to the YOC.

At 4:12 p.m., Smith contacted Assistant Superintendent Heller, who asked if CPS had been called; Smith replied that CPS had not been called. Heller instructed Smith to call CPS. Smith, Sloan, and McCowan then called CPS at 4:29 p.m., and they informed CPS that G.G. had reported a rape. CPS stated that it would "screen out" the call – that is, it would not be investigating the allegation – because it wasn't something that fell within their "child abuse jurisdiction." Smith Dep. at 85:22-86:1. CPS asked whether it should contact law enforcement, but Smith replied that MCHS would notify police. Smith did not thereafter call the police because, "at some point after [he] got off the phone [he] knew that the police . . . were at the hospital." *Id.* at 86:14-17.

At 8:15 p.m., Smith and Sloan told Muncie Schools Superintendent Dr. Eric King about the rape. When Sloan asked Dr. King whether he knew anything about the rape, Dr. King replied that he didn't know anything about it. Smith and Sloan then proceeded to tell Dr. King about the rape:

---

[3] Ross does not know who called police.

> Again, just that this student had claimed she had been raped in a bathroom and
> what we had done and who the other student was and that she had been taken to
> the hospital and . . . just the information we knew at that time he was given.

Smith Dep. at 89:22-90:2; *see also id.* at 90:10-13. Smith explained that there was some concern

that the press would learn of the police report and a story would appear in the paper in the

morning.

The following day, November 10, 2010, King had a meeting with Heller, who indicated

to Dr. King that he had received information that the student may have changed her story. King

Dep. at 119:7-10. Heller had received the information from Associate Principal Samuels. *Id.* at

120:19-23. In talking thereafter with the media, Dr. King reported that G.G.'s allegations were

"vague" and she "may have recanted."

Also on November 10, 2010, Smith, Edwards, Jarvis, Samuels, and McCord had a

meeting about the rape. When Detective Edwards confronted Smith about why he had not told

the MCHS security guards about the rape when it was first reported, Smith replied that he was

following the directive of the administration.

Moore returned to school on November 10, 2010. According to Smith, he had not yet

been disciplined because, "at that point, . . . to the best of [Smith's] knowledge, he was claiming

it didn't happen and she was, obviously, claiming that it was."

On November 15, 2010, Smith met with Moore and his mother. Smith informed Moore

that G.G. had transferred schools and that he had nothing to worry about.[4] Moore's mother

informed Smith that Smith had told the police that he and G.G. had had consensual sex in the

bathroom. Smith reported this information to Heller and Sloan and they discussed the

---

[4] The Defendants object to the admissibility of this evidence. However, without ruling on
the Defendants' objection, the Court includes this evidence in its statement of facts because it
does not affect the outcome of its ruling on the present motion.

consequences for having consensual sex on school property. Although no punishment was delivered at that time, the process for suspension and expulsion from school was started. Ultimately, Moore was suspended for ten days pending expulsion. The record does not divulge how that school discipline process progressed, if at all, following Moore's arrest for rape.[5]

### MCHS's Response

Based on the foregoing, MCHS was investigated for failure to report child abuse under Indiana Code § 31-33-5-1, *et seq*. Principal Smith was ultimately convicted of failing to report; however, in January 2013, Smith's conviction was overturned by the Indiana Court of Appeals. That case is still pending. The facts regarding MCHS's handling of the report that are relevant to the instant case are as follow.

Assistant Principal McCord was the first administrator contacted by G.G., but she did not contact police. When asked whether not calling the police was "normal policy and procedure," McCord explained, "The expectation was given to me earlier in the school year that – and I was told this point blank – I was to report immediately anything of significance or importance to Mr. Smith." McCord Dep. 49:23-50:1. She was not given any directive beyond that. *Id.* at 50:3. McCord also explained what went through her mind when she first learned from G.G. what had happened.

> I'll be honest with you, that day I looked at my phone for just a brief second and thought *I need to* – and then I grabbed my radio and I honestly almost did call for security, and then that just went back through my mind, *I've got to tell him.*

*Id.* at 50:11-15. According to McCord, she believed a rape had occurred when initially told of it by G.G., but she did not contact the police. Instead, she radioed Smith because he had told her to report everything of significance to him after she had failed to notify him of an incident in which

---

[5] The Defendants state in their brief in support of the instant motion that Moore ultimately pled guilty to a felony sex offense.

a student was accidentally locked out of the school after gym class. *Id.* at 52:18; 50:25-52:22. When McCord was reprimanded for that incident, Lon Sloan, the human resources director, told McCord, "that [her] duty was not only to protect the students, but to protect [her] building principal too." *Id.* at 50:11-18; 52:18-22. "Protecting" her building principal meant protecting him "[f]rom anything that may put him in an awkward position," including causing liability to the school. *Id.* at 50:19-25.

Principal Smith was the second administrator made aware of the rape. He admits that calling the police and the YOC could have been done simultaneously, but he wanted to notify the YOC first. However, he did not thereafter call the police based on administrative directive.

> Q: And the administration told you not to call the police because you didn't know what kind of situation you had?
> A: Yes.
> Q: And you said you read G.G.'s statement before two o'clock?
> A: Yes.
> Q: And you testified that she stated a rape had occurred in that statement?
> A: Yes.
> Q: Did that tell you what type of situation you had?
> A: Yes.
> Q: That a crime had been committed of rape?
> A: That she had - - that that was her claim, yes.
> Q: That she had been raped?
> A: Yes.
> Q: And you did not notify the police at this time?
> A: No.
> Q: Based on administration's directive?
> A: Yes.
> ….
> Q. And based on [her statement] did you have reason to believe that a rape had occurred?
> A. Yes.
> Q. But you did not report to the police because the administration told you not to yet?
> A. Right.

Smith Dep. at 80:12-82:8. Smith also did not secure the bathroom as a crime scene or collect and preserve any evidence. Furthermore, while Smith prompted J.S. and G.G. to write an account of

8

the event, he did not solicit a written account from Moore. Detective Hopper testified that it is unusual to only have the victim write a statement and not the accused.

## MCHS Security

MCHS employs security guards who are licensed police officers and have arrest powers. The officer-guards patrol the school, but there is no policy on the areas that are patrolled within the school; rather, they were reminded to be "mobile" and not stand in one place.[6] Smith Dep. at 105:8-11. The restroom in which G.G. was raped is located in a hallway containing special education classrooms, a health classroom, a science classroom, and freshman lockers. The hallway, which leads to the gym, is not a "main" hallway, McCord Dep. at 57:10, and during lunch time there is no security in that hallway. When asked whether students knew that hallway was vacant during lunch, assistant principal McCord replied, "They probably put it – you know, put two and two together. But I mean, they probably would know." *Id.* at 58:8-12.

At the time of the rape there were sixteen cameras in MCHS that overlooked primary areas of the school, but there were no cameras in the hallway where the restroom at issue was located. Currently, there are fifty-four cameras at MCHS.

## MCCS Policies and Procedures

Defendant Muncie Community School Corporation ("MCCS") maintains its own policies for reporting child abuse and sexual assault of students in the school. The policies include, in pertinent part:

CHILD ABUSE AND NEGLECT

---

[6] McGinnis asserts that "the guards are only required to stay in the main areas of the building, such as the cafeteria during lunch" but the evidence cited for this proposition does not support it. McGinnis also asserts that the "security guards were not responsible for patrolling the restrooms," but the cited evidence does not support this assertion either. The only evidence on this point is that the security guards "occasionally" patrolled the restrooms. Smith Dep. at 60:25-61:1.

Each staff member employed by this Corporation shall be responsible for reporting immediately every case, whether ascertained or suspected of abuse, abandonment, cruelty, or neglect resulting in physical or mental injury to a student by other than accidental means. The staff member or appropriate administrator in the presence of the staff member shall immediately call the Delaware County Division of Family and Children or Muncie Policy [sic] Department Juvenile Aide [sic] Division and shall secure prompt medical attention for any such injuries reported.

A. DEFINITION OF SEXUAL HARASSMENT

Sexual harassment is unwelcome sexual advances, request for sexual favors, and other inappropriate verbal, nonverbal, or physical conduct of a sexual nature when made to a student by any employee or another student or other third party when:

[ . . . . ]

3. Such conduct has the purpose or effect of substantially interfering with a student's academic performance or creating an intimidating, hostile, or offensive educational; or

4. The student has indicated that such conduct is unwelcome by his or her conduct or verbal objections.

B. EXAMPLES OF SEXUAL HARASSMENT

Sexual harassment may include, but is not limited to, the following:

1. Verbal abuse of a sexual nature;

2. Unwelcome touching;

3. Pressure for sexual activity.

Teachers and principals did not receive training on these policies; rather, they were responsible for reading the policies themselves.

Smith explained that none of the policies of MCCS regarding child abuse, sexual assault or sexual misconduct require the school to perform an investigation to verify the accuracy of an allegation prior to reporting it. However, Dr. King explained that MCCS must first gather the

facts to determine what occurred prior to taking steps to satisfy the notice requirement and

immediate reporting:

> Q:      When should the police be notified?
>
> A:      Almost immediately.
>
> Q:      Almost immediately?
>
> A:      Um-hum.
>
> Q:      And now I'm going to turn things around to you and ask you what that means?
>
> A:      Almost immediately. First you have to gather the facts, what happened. Okay this student says this, this student says that. So now we have a basis to give notice that an incident actually occurred—
>
> Q:      Right. And no—
>
> A:      Of allegedly occurred.
>
> Q.      Okay. I'm sorry, I cut you off. And – but your other testimony was that the first thing you do is, you want to see if it's a credible – whether you think a crime has been committed, right? Isn't that—
>
> A.      We need to gather the facts. If a student walks into an office and says a certain thing happened, okay. Well, who was involved. Then we bring the other student in. This is the allegation that's being brought against you. What do you have to say. If there's an admission or if there's a denial, then now we have to make a determination what do we do next. In an instance where it's rape or an allegation of rape, then the notice has to go or should go immediately to the appropriate authorities; those appropriate authorities being the police, Child Protective Services, guardian or a parent.

King Dep. at 37:10-38:13.

## MCCS's Arrest Policy

According to Assistant Principal McCord, Principal Smith "preferred to have a hand in

decisions that were made involving the police." McCord Dep. at 34:8-10. For example, if a

student were to be placed in custody, he wanted to be involved in that decision-making process.

McCord explained that Smith "didn't want me coming or someone coming and telling him so-and-so is being arrested. He wanted to know before it happened." *Id.* at 34:25-35:3.[7]

Smith testified that his involvement in police matters in the school was at the direction of the administration. According to Smith, Sloan stated at an administrators' meeting that Dr. King "felt like too many student arrests were occurring and that Dr. King didn't feel like school was a place where a student should be arrested." Smith Dep. at 22:14-20. When asked whether he was told not to contact police, Smith replied: "I don't know if I could think of a specific standard or procedure that was changed. I think it was just a – he didn't say now we're going to do this or now we're going to do that or anything. It was just – it was his opinion and . . . ." *Id.* at 23:7-11.

McCord described an incident in which Smith did not want a student taken into custody:

> The young man got very angry over something and was hitting a locker, I mean just pounding on the locker. And one of our security officers told him to stop and then he just continued and he told him again to stop and he wouldn't. And then they placed him in handcuffs, and once they're in handcuffs they're leaving.
>
> And they took him in handcuffs and got him out of the hallway and down into our office area and said he was going to be taken into custody. And Mr. Smith didn't want that to happen, but it did anyways.

McCord Dep. at 35:9-20. Smith also described an incident in which a teacher sent a student to the office because the student was "acting suspicious." Smith Dep. at 25:4. The security guards wanted to give the student a Breathalyzer test, but Smith believed that a Breathalyzer "was generally not something that was done in school," so he called Sloan. *Id.* at 25:12-15. Sloan told Smith that a Breathalyzer should not be done, but that if Smith thought the student was under the influence of something, there were procedures to follow.

---

[7] McGinnis quotes McCord as characterizing Smith's supervision of the school as "martial law," but that is not an accurate representation of her testimony: "And he wanted – I don't want to say martial law – he just wanted to – he wanted to be involved in if a student was going to be taken into custody." McCord Dep. at 34:22-25.

## McGinnis's and G.G.'s Claims

Plaintiffs Georgette McGinnis and G.G. now bring the instant action, alleging that the Defendants violated McGinnis's and G.G.'s rights in a number of ways. They assert the following claims against the Defendants:[8]

I. § 1983 claim for violation of McGinnis's and G.G.'s 14th Amendment substantive and procedural due process rights, including McGinnis's rights to "familial relationships" and control of G.G.'s education and G.G.'s rights to life, liberty, and the pursuit of happiness, right to an education, and right to equal protection of the laws

II. MCCS's failure to train its officials and teachers

III. Title IX deliberate indifference to sexual harassment

IV. State law negligence

V. State law negligent supervision and training

VI. State law willful, wanton, and reckless conduct

VII. Negligence causing mental and emotional distress to G.G.

VIII. Liability of MCCS under *respondeat superior*

IX. Defamation

X. Spoliation of evidence

Defendants MCCS, Dr. King, and Smith now move for partial summary judgment on the Plaintiffs' federal claims, as well as their claims for defamation and spoliation of evidence.

## III.   DISCUSSION

The Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

---

[8] In summarizing the claims below, the Court expresses no opinion on whether each count is in fact a separate legal claim. It merely denominates each claim as McGinnis and G.G. have alleged it in their Complaint.

The Supreme Court has thus recognized the "'constitutional shoals' that confront any attempt to derive from congressional civil rights statutes a body of general tort law . . . ; A fortiori, the procedural guarantees of the Due Process Clause cannot be the source for such law." *Id.* (citation omitted). Claims pursuant to 42 U.S.C. § 1983, therefore, cannot be founded on negligence, but rather only sweep in those "deliberate decisions of government officials [that] deprive a person of life, liberty, or property." *Daniels v. Williams*, 106 S. Ct. 662, 665 (1986). In other words, § 1983 extends only so far as the intent behind the Due Process Clause – that is, securing the individual from the "arbitrary exercise of the powers of government." *Id.* (citation omitted). This case is an example of the limited protections of that clause.

### A.  Failure to Protect and Failure to Train

McGinnis and G.G. bring suit under Count I pursuant to 42 U.S.C. § 1983, which provides a civil right of action against persons who, under color of state law, deprive a person of her constitutional rights, privileges, and immunities. Here, McGinnis and G.G. allege violations of McGinnis's and G.G.'s procedural and substantive due process rights.

Specifically, the Plaintiffs allege that the Defendants "deliberately failed to protect G.G. with conscious knowledge of the consequences that would result." McGinnis Resp. at 15, No. 77. As Defendants point out, however, the Plaintiff's analysis of just *what* the Defendants failed to protect G.G. *from* lacks precision. As best the Court can tell, McGinnis and G.G. raise their claim under two theories, one relating to the rape itself, and the other relating to its handling. It is useful at the outset to separate the analysis into these two theories, as each theory orients the analysis of the claim. The Court will thus address the § 1983 claim with respect to each theory.

14

*1.      The Rape of G.G.*

McGinnis and G.G. allege that the Defendants failed to protect G.G. from the danger of an attack by another student. "[T]he Due Process Clause of the Fourteenth Amendment generally does not impose upon the state a duty to protect individuals from harm by private actors." *King v. East St. Louis Sch. Dist. 189,* 496 F.3d 812, 817 (7th Cir. 2007). There are exceptions, however; the state has a duty to protect individuals against dangers the state itself creates under the "state-created danger doctrine." *Id.* The doctrine is governed by three primary principles: (1) the state, by its affirmative acts, must create or increase a danger faced by an individual; (2) the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual; and (3) the state's failure to protect the individual must shock the conscience. *Id.* at 818. What conduct shocks the conscience is a question of law. *Hayes v. Faulkner Co., Ark.*, 388 F.3d 669, 674 (8th Cir. 2004) (citing *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998)).[9]

First, McGinnis and G.G. contend that Dr. King's "unwritten policy" requiring criminal matters to be handled within the school increased the danger to G.G. because "students know they will not be criminally sanctioned for their actions if they are committed within the school." McGinnis Resp. at 17, No. 77. However, as the Defendants point out, there is no direct evidence that a policy of the kind described existed. Rather, the only evidence the Plaintiffs point to is that

---

[9] In *Slade v. Board of School Directors of City of Milwaukee*, Judge Posner expressed the Seventh Circuit's "unhappiness with the use of 'affirmative act' and 'shocks the conscience' as touchstones of liability." 702 F.3d 1027, 1033 (7th Cir. 2012). Instead, Judge Posner advocated a simple standard whereby "it violates the due process clause for a government employee acting within the scope of his employment to commit a reckless act that by gratuitously endangering a person results in an injury to that person." *Id.* The parties to this case, however, have briefed the issue in terms of the "shocks the conscience" test. Inasmuch as Judge Posner implicitly recognizes that the "shocks the conscience" test is just a complicated term for the test he articulates, the Court finds it appropriate to employ the language embraced by the parties.

Sloan told Smith that Dr. King "felt like too many student arrests were occurring and that Dr.

King didn't feel like school was a place where a student should be arrested." Smith Dep. at

22:14-20. When asked whether he was told not to contact police, Principal Smith replied: "I

don't know if I could think of a specific standard or procedure that was changed. I think it was

just a – he didn't say now we're going to do this or now we're going to do that or anything. It

was just – it was his opinion and . . . ." *Id.* at 23:7-11. McGinnis and G.G. contend that the

existence of this policy is evidenced by the fact that "Principal Smith even went as far as

stopping arrests from being made when criminal actions were present." McGinnis Resp. at 17,

No. 77. Again, however, the evidence does not support this assertion. Rather, the evidence is that

Smith prevented the administration of a Breathalyzer test and that he was unhappy with the arrest

of another student, but the arrest was nevertheless made. No reasonable jury could find from this

evidence alone that the policy described by the Plaintiffs existed.

   McGinnis and G.G. also contend that Smith's policy that all matters "of significance"

should first be reported to him contributed to the danger realized by G.G. McGinnis Resp. at 17,

No. 77. There is sufficient evidence on this point to support a jury finding that this policy

existed. There is, nevertheless, a remaining evidentiary problem here in that the Plaintiffs fail to

put forth any evidence from which a jury could conclude that the students knew of this policy

and that it affected their decisionmaking in some way. As the Defendants point out, the

Plaintiffs' theory on this point is mere speculation, Defs.' Reply at 9, No. 80, and speculation is

insufficient to withstand summary judgment.

   To the extent that McGinnis and G.G. can be read to sweep in the administration's

handling of the rape after it occurred as evidence in support of this theory, their claim

nevertheless fails. While the Defendants' handling of the report could be evidence of their

16

attitude toward student violence, it is not apparent how this mishandling could be evidence of acts or omissions that caused the rape or increased the risk that it would occur and the Plaintiffs do not articulate for the Court a theory under which it is relevant. In other words, McGinnis and G.G. fail to identify a link between the Defendants' mishandling of the reported rape with their conduct before the rape such that their mishandling is evidence of how Defendants created or increased the danger to G.G. before it occurred.[10]

Second, the Plaintiffs contend that G.G. was the foreseeable victim of a crime. According to McGinnis and G.G., "the rape of G.G. was foreseeable in the area in which it occurred because there had been a prior incident of oral sex occurring within MCHS in a similar location. However, Defendants failed to add any additional security or cameras in this area of the building after they learned of the report of oral sex." McGinnis Resp. at 19, No. 77. While Smith testified that he was aware of one incident of oral sex occurring in a locker room, it is again not clear how knowledge of one sexual act in a locker room renders it foreseeable that a rape would occur at the school. McGinnis and G.G. also contend that "[d]efendants' actions of interfering with criminal arrests within the school allowed students to believe that no matter what they did, they would not get arrested." *Id.* at 18. As the Court discussed above, McGinnis and G.G. have not established that such a policy existed. Beyond that, there is no evidence that students knew of the policy, nor is there evidence that administrators knew that students knew of the policy. Such evidence would be required in order to draw the links necessary to make this inference reasonable.

---

[10] Of note, McGinnis and G.G. do not argue that the Defendants' response is one example of a policy of not responding to student violence in an appropriate way such that students believed they could act with impunity.

Third, McGinnis and G.G. assert that Dr. King's unwritten policy regarding "non-reporting of criminal matters to the police" shocks the conscience. Dr. King "knew that such actions of the Administrators were occurring, approved it, condoned it, and allowed it to continue on an unwritten policy basis," so the Plaintiffs argue, and Dr. King therefore "acted with knowing, deliberate and reckless indifference for the safety of all students within MCHS." *Id.* at 24. The Court agrees that such a policy, if true, would shock the conscience; however, the evidence of record fails to support the Plaintiffs' theory on this point as well. At the risk of belaboring the point, the Court reiterates that there is no evidence that such a policy existed, let alone evidence that Dr. King created it, knew about it, and approved it.[11]

### 2. *The Damage Suffered from Defendants' Response*

McGinnis and G.G. assert that the "Defendants made the conscious decision not to believe G.G., not to preserve all the evidence, and not to properly report the rape pursuant to a statutory mandate knowing that such actions would result in substantial harm to G.G." McGinnis Resp. at 15, No. 77. While the Plaintiffs do not specifically articulate what harm they assert G.G. suffered as a result of the Defendants' response to the report of the rape, as opposed to harm from the rape itself, the Court will consider the following harms articulated by the Plaintiffs in various parts of their brief as comprising this claim: delay of medical treatment, delay of police

---

[11] At each stage of the analysis, McGinnis and G.G. also point to measures MCCS undertook following G.G.'s rape. For example, they point to a "new" arrest policy. According to McGinnis and G.G., after implementation of the new policy, "the number of arrests within MCHS rose dramatically until students figured out they could no longer get away with committing criminal acts on school premises." This argument is initially problematic, as the Plaintiffs cite generally to McCord's *entire* deposition for this proposition. S.D. Ind. L.R. 56-1(e) ("The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."). However, even if true, the Plaintiffs' use of this evidence, as well as evidence of the installation of additional security cameras, is inadmissible to prove negligence or culpable conduct. Fed. R. Evid. 407.

investigation of rape, disbelief of a victim's allegation of rape, and failure to mitigate the emotional harm caused by the rape.

At its core, the Plaintiffs' argument is that Smith's failure to comply with the mandatory reporting statute shocks the conscience. McGinnis and G.G. point out that the statute imposes a "non-negotiable," "non-transferrable," "non-discretionary duty" to immediately report suspected child abuse or neglect. Ind. Code § 31-33-5-4 ("A person who has a duty under this chapter to report that a child may be a victim of child abuse or neglect shall immediately make an oral report to: (1) the department; or (2) the local law enforcement agency.") Any failure to comply with that statutory requirement, they argue, shocks the conscience. However, there would be a number of problems with such a rule. First, this rule conflates violation of a state statute with violation of the Constitution. In Indiana, the unexcused violation of a statutory duty constitutes negligence per se, *Kho v. Pennington*, 875 N.E.2d 208, 212-13 (Ind. 2007), but, with regard to constitutional violations, "conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process." *King*, 496 F.3d at 819. Second, holding that conduct in violation of a statute per se shocks the conscience ignores the "necessarily fact-bound inquiry" required. *Id.* at 818-19. Rather, the better practice is to look at the substance and totality of the conduct alleged here and determine whether it falls toward the more culpable end of the spectrum.

A short recap of the facts is therefore necessary. The rape occurred sometime before 12:20 p.m. Once notified by Assistant Principal McCord, Principal Smith summoned the associate principal and the school nurse, who arrived by 12:38 p.m. Smith then instructed J.S., G.G.'s friend, to write a statement about what she knew. Samuels, McCord, and Smith then met to decide what to do next. Smith told McCord to review the video footage and he told Samuels to

call the YOC. When Samuels asked whether she should call security, Smith responded, "Not

yet." At 12:45 p.m., Samuels contacted the YOC. At 1:10 p.m., Smith attempted to contact

Assistant Superintendent Heller, but Heller was unavailable, so Smith sought guidance from

Directory of Secondary Education McCowan. McCowan instructed Smith to question Moore,

which Smith then did at approximately 1:25 p.m. During the interview, Moore was not asked to

write an account, although Samuels took notes of his responses. Smith told Moore he "had

nothing to worry about." Smith released Moore back to class, but Smith instructed Athletic

Director Jarvis and Security Guard Edwards to search G.G.'s and Moore's lockers for notes.

Smith continued to conduct assistant principal interviews until shortly after 4 p.m., when Smith

called CPS after being instructed to do so by Heller. CPS asked whether it should contact law

enforcement, but Smith replied that MCHS would notify police. Smith did not thereafter call

police because he had learned that police had already been contacted.

On the whole, Smith's conduct does not fall so far on the spectrum as to shock the

conscience. The record reflects that Smith credited G.G.'s report, at least as an allegation

requiring further attention, and began investigating it. He summoned a nurse and contacted

school administrators for guidance. He questioned Moore. He contacted CPS four hours after the

report was first made and did not call the police because the police had already been called. He

continued to investigate the incident the following day.

While the Plaintiffs seem to equate Smith's actions with a cover-up of sorts, they do not

point to any evidence to support this theory. They suggest that the Defendants were concerned

more for their own reputations and the reputation of the school than the safety of G.G., but the

record does not bear this out. It is true that the Defendants did undertake their own investigation,

but the only evidence about the reason for the investigation is that the Defendants were

"concerned about determining the veracity of the allegations." Without more, it is not reasonable to infer that the Defendants consciously delayed reporting the rape in order to distance the violence from the school.

Of course, the verdict is literally still out on the propriety of that investigation in light of the statute, which requires immediate reporting. Ind. Code § 31-33-5-4. *Compare Smith v. Indiana*, 982 N.E.2d 348, 363 (Ind. Ct. App. 2013) ("An allegation that an individual engaged in child abuse is a serious claim, and a reasonable investigation made in good faith of such an allegation prior to making a report is not improper and does not deprive the person required to make such a report of statutory immunity."), *with id.* at 364 (Vaidik, J., dissenting) ("I believe such a verification process is contrary to the statute and, if permitted, may have the highly undesirable result of suppressing or deterring reports of abuse."), *trans. granted*, 18S02-1304-CR-297 (Apr. 29, 2013). Yet whether this conduct is criminal under the statute is not dispositive of whether it is conscience shocking. On the whole, Smith's conduct falls toward the negligence end of the spectrum. The delay in reporting the rape in this context does not shock the conscience and the Defendants are therefore entitled to summary judgment on this claim.[12]

As the Defendants point out, "[i]t is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [the Plaintiff's] constitutional rights." *King*, 496 F.3d at 812; *see also Tesch v. Co. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim."). Accordingly, as the Plaintiffs' claims for constitutional violations in the

---

[12] In fact, the disagreement among the Indiana Court of Appeals judges reinforces the conclusion that Smith's conduct, regardless of criminality, does not rise to the level of conscience-shocking conduct.

nature of failure to protect G.G. fail, their claims for failure to protect and failure to train against MCCS fail as well. The Defendants' motion for summary judgment on Count I and Count II in their respective entireties therefore must be granted.[13]

## B.  TITLE IX HARASSMENT CLAIM

McGinnis and G.G. also assert a claim against MCCS for sexual harassment. "[A] school district receiving federal funding may be liable for damages under Title IX when one student sexually harasses another." *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003). MCCS does not contest that it is subject to Title IX, but it nevertheless contends that it is entitled to summary judgment on this claim.

Liability under Title IX for peer-to-peer sexual harassment exists where a school is "deliberately indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). MCCS contends that "a single incident of sexual assault, no[ ] matter how severe, does not support a claim of peer harassment" because it "does not constitute systemic deprivation of educational opportunities." Defs.' Br. at 24, No. 73. The Court simply cannot agree. As Defendants admit, the physical harassment perpetrated here – rape – is "inarguably severe." *Id.* A single act of harassment such as this may suffice in the context of a Title VII hostile environment claim, and the Defendants point to no reason why the result should be different here, for regardless of environment, the impact on the victim is the same. "The continued presence of a rapist in the victim's workplace can render the workplace objectively hostile because the rapist's presence exacerbates and reinforces the severe fear and

---

[13] In so ruling, the Court expresses no opinion on the Defendants' alternative theories, such as the theory that Dr. King is not liable because he was not a policymaker.

anxiety suffered by the victim." *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008). So too, if not more so, in a school. The Court recognizes that the United States Supreme Court thinks it "unlikely that Congress would have thought [a single instance of one-on-one peer harassment] sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Davis*, 526 U.S. at 629. However, the Supreme Court also acknowledged that, "in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have [the systemic effect of denying the victim equal access to an educational program or activity]." *Id.* This case gives credence to that theory. The solution to the legitimate concern expressed by the Supreme Court lies in the second step of the inquiry – whether the school responded in a way that was not "clearly unreasonable." It is this inquiry to which the Court now turns.

"Once school officials have actual notice of sexual harassment, *Davis* imposes a duty to act. But as long as the school's response is not 'clearly unreasonable,' it cannot have acted with the requisite deliberate indifference to incur Title IX liability." *Gabrielle M.*, 315 F.3d at 817. To establish deliberate indifference, the plaintiff must show an official decision not to remedy the violation. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).Whether a given response is not "clearly unreasonable" is an inquiry that may be, "in an appropriate case," determined by the court as a matter of law. *Gabrielle M.*, 315 F.3d at 817.

McGinnis and G.G. argue that Smith was deliberately indifferent to G.G.'s rape when he told Moore that Moore had "nothing to worry about." Assuming here that Smith made the statement, the record reveals that Moore did, in fact, have something to worry about, as Smith continued to investigate the incident. In fact, even when Moore's story was that consensual sex

had occurred, Smith initiated discipline against him: suspension pending expulsion. It is Smith's actual response, not what he said, that triggers or avoids liability here, and the record establishes that Smith's investigation, although by no means ideal, was not "clearly unreasonable" as a matter of law. The Defendants are therefore entitled to summary judgment on this claim.[14]

### C.  SUPPLEMENTAL STATE LAW CLAIMS

The Defendants also move for partial summary judgment on the state law defamation and spoliation claims asserted against them. In addition to those claims, McGinnis and G.G. also assert claims against the Defendants for violation of state law sounding in negligence, and she asserts claims for assault, battery, and false imprisonment against Defendant Steven Moore.

The Court's jurisdiction over the Plaintiffs' remaining state law claims is based on 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based on state law that are closely related to the federal claims in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008). None of those exceptions apply here. Accordingly, the

---

[14] McGinnis and G.G. have withdrawn their assertion of this claim against individual defendants Smith and Dr. King.

Court declines to exercise supplemental jurisdiction over the remaining state law claims.[15]

Accordingly, the Court also declines to rule on the Defendants' motion for partial summary

judgment on the defamation and spoliation claims.[16]

## IV.   CONCLUSION

For the foregoing reasons, the Defendants' motion for partial summary judgment on the

Plaintiffs' § 1983 and Title IX claims is **GRANTED**. The Court declines to retain jurisdiction

over the Plaintiffs' state law claims; those claims are **REMANDED** to the Delaware County

Circuit Court. **The Clerk shall mail a certified copy of this order to the Clerk of the**

**Delaware County Circuit Court.**

SO ORDERED:   06/05/2013

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[15] McGinnis and G.G. assert only state law claims for assault, battery, and false imprisonment against Defendant Steven Moore. Although it appears that Moore has not been properly served, see Fed. R. Civ. P. 4(m), this fact has no effect on the Court's decision to decline to exercise jurisdiction over the Plaintiffs' state law claims in favor of remand to state court.

[16] In the course of adding G.G. as a real part in interest, McGinnis has moved for leave to file a second amended complaint adding two "counts" regarding her interests. Dkt. No. 87. These potential claims would not affect the Court's analysis of the federal claims raised in the Defendants' motion and the Court therefore leaves McGinnis's motion for the state court to decide.